## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

MARY I. HEIDEN,

                    **Plaintiff,**

      **vs.**

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

                  **Defendant.**

**CASE NO.  4:13CV3118**

**MEMORANDUM
AND ORDER**

Mary I. Heiden filed a complaint on June 12, 2013, against Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration.  (ECF No. 1.)  Heiden seeks a review of the Commissioner's decision to deny her application for supplemental security income benefits under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 et seq. The defendant has responded to Heiden's complaint by filing an answer and a transcript of the administrative record.  (*See* ECF Nos. 13, 14).  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated October 21, 2013, (ECF No. 16), each of the parties has submitted briefs in support of her position.  (*See* generally Pl.'s Br., ECF No. 17; Def.'s Br., ECF No. 24, Pl.'s Reply Br., ECF No. 25). After carefully reviewing these materials, the Court finds that the Commissioner's decision should be affirmed.

### I. PROCEDURAL HISTORY

Heiden, who was born May 20, 1971, (tr. 134), filed an application for disability benefits under Title XVI on May 14, 2010. (Tr. 166). Her claim was denied initially on January 11, 2011, and on reconsideration on May 9, 2011. (Tr. 70-73, 79-82). Heiden

requested a hearing before an administrative law judge (ALJ) (tr. 88), and the hearing was held on February 14, 2012. (Tr. 27-63). In a decision dated April 13, 2012, the ALJ found that Heiden had not been under a disability since April 27, 2010, the date of the application for benefits. (Tr. 20).

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. *See id.* Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). The ALJ found that Heiden had not been engaged in substantial gainful activity since April 27, 2010. (Tr. 12).

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), (c); 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting."  20

2

C.F.R. § 404.1521(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c).

The ALJ found that Heiden had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, myofascial pain syndrome, status-post left rotator cuff repair, history of deep vein thrombosis in the left upper extremity, and median nerve neuropathy of the left upper extremity. (Tr. 12). The ALJ determined that the following impairments were non-severe: depression, status-post cervical cancer, migraines, chronic obstructive pulmonary disease/asthma, and arthritis in the knee. Those impairments were either no longer present or were controlled. (Tr. 12).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ found that Heiden did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[1] to determine whether the impairment or impairments prevent the claimant from

---

[1]    "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

3

engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).   If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.   *See* 20 C.F.R. § 404.1520(a)(4)(iv), (f).  The ALJ found that Heiden was unable to perform any past relevant work. (Tr. 19).

At step five, the ALJ must determine whether the claimant is able to do any other work considering her RFC, age, education, and work experience. If the claimant is able to do other work, she is not disabled. The ALJ determined that Heiden had the RFC to lift up to 10 pounds on occasion, could stand and/or walk for two hours out of an eight-hour workday, and could sit for six hours out of an eight-hour workday. Heiden could frequently balance, occasionally climb ramps or stairs and stoop, but should never climb ladders, ropes or scaffolds, kneel, crouch or crawl. Heiden should avoid overhead reaching with her left upper extremity, but could frequently use her fingers. She should avoid operational control of moving machinery, unprotected heights, and hazardous machinery. (Tr. 15). The ALJ found that Heiden was not disabled and would be able to perform the requirements of representative occupations such as call out operator, a sedentary, unskilled position with 1,270 jobs available in Nebraska and 53,770 jobs available nationally; final assembler optical, a sedentary, unskilled position with 980 jobs available in Nebraska and 229,240 jobs available nationally; and document preparer-microfilm, a sedentary, unskilled position with 354 jobs available in Nebraska and 63,832 jobs available nationally. (Tr. 20).

The Appeals Council of the Social Security Administration denied Heiden's request for review on April 12, 2013. (Tr. 1-5.) Thus, the ALJ's decision stands as the

final decision of the Commissioner, and it is from this decision that Heiden seeks judicial review.

## II. FACTUAL BACKGROUND

### A.    Medical Evidence

The medical records begin in May 2009, when Heiden saw Lorraine L. Edwards, M.D., at Central Nebraska Neurology, P.C., for migraine and tension headaches. (Tr. 254). Heiden reported that she had tension headaches four times a week and migraine headaches three times a week. She said she received relief for migraines from Relpax which she took twice weekly. She said she took Zanaflex for tension headaches, but it made her sleepy. Heiden reported she had been denied disability, but she did not feel she was able to work because of the headaches. Dr. Edwards suggested Heiden take an extra Zanaflex during the day for tension headaches and advised her to return in one year. (Tr. 254).

Heiden returned to Dr. Edwards in March 2010. (Tr. 252). Heiden reported that she got dizzy when walking through the grocery store, was distractible, got lost when she drove, and felt photophobic. (Tr. 252). She was prescribed Depacon with Ativan and the dosage of Topamax was increased. (Tr. 252). By April 2010, Heiden reported that she was doing well. (Tr. 250). A head CT scan was negative and showed no change from one completed in March 2006. (Tr. 256). A sinus CT scan showed evidence of acute and chronic sinusitis. The remaining paranasal sinuses were well-aerated. There was occlusion of the left osteomeatal unit and the right osteomeatal unit was narrowed. (Tr. 257).

In July 2010, Heiden reported she had been having pain for a month in her right low back and buttock that radiated to just below her right hip. (Tr. 308). She was diagnosed with right hip/ischial "bursitis" and prescribed a generic pain medication and exercise. (Tr. 308).

In September 2010, Heiden was diagnosed with stage IIB invasive squamous cell carcinoma. (Tr. 266, 271). David R. Crotzer, M.D., a gynecologic oncologist, recommended chemotherapy and radiation. (Tr. 271).  In preparation for chemotherapy, Heiden had a port placed in her left subclavian. She had completed three cycles of chemotherapy and radiation by November 2010, when she developed deep vein thrombosis in the left arm. (Tr. 303, 344-46). She was hospitalized for three days and the port was removed. (Tr. 354). Heiden continued to complain of pain in her left upper arm. On December 17, 2010, x-rays of Heiden's shoulder showed no fracture, dislocation or other bony abnormality. There was a small benign bone island at the head of the left humerus. (Tr. 322). A Doppler ultrasound of her upper arm showed a small amount of residual nonocclusive thrombus within the left subclavian vein. It was considerably improved from November 20, 2010. (Tr. 323).

While undergoing chemotherapy in November 2010, Heiden again complained of pain in her right low back and buttock, radiating to her leg just below the knee. (Tr. 310). She was able to do straight leg raising, but was in too much pain to do strength testing. She was diagnosed as suffering from severe right sciatica and urinary discomfort. Heiden was given Demerol, Percocet, Naprosyn, and Flexeril. (Tr. 310). A CT scan of the lumbar spine showed no evidence of fracture or metastatic lesion. Heiden had a small chronic central disc herniation at L5/S1 with mild facet arthropathy resulting in

6

mild central stenosis with mild bilateral foraminal stenosis more pronounced on the right at L5/S1. She also had moderate degenerative disc disease at T12/L1 and L1/2, and other early degenerative changes of the lumbar spine with no other central or foraminal stenosis. (Tr. 332). The scan showed mild to moderate bilateral sacroiliac osteoarthritis and a small nonobstructing left renal stone. (Tr. 333). Heiden had a steroid injection in her back on November 15, 2010. (Tr. 305). She reported on December 15, 2010, it that the injection had helped. (Tr. 339).

On December 23, 2010, Heiden began receiving high dose-rate brachytherapy. (Tr. 367). She had additional treatments on December 27, 2010, January 3, 2011, January 7, 2011, and January 13, 2011. (Tr. 378, 382, 433, 435).

Heiden complained that her arms and legs hurt and felt heavy when she visited Richard M. Fruehling, M.D., on February 4, 2011. He suspected that Heiden had post-chemotherapy neuropathy. (Tr. 450). Her migraine syndrome was controlled. (Tr. 450). Heiden returned to Dr. Edwards on February 7, 2011, and reported numbness in her fingers and forearm and difficulty moving the arm and fingers. Heiden had not received any physical therapy. (Tr. 414). Dr. Edwards diagnosed Heiden with median neuropathy. (Tr. 414). There was no evidence of cervical radiculopathy. Dr. Edwards said it would "hopefully heal" with time and physical therapy and could take up to two years. (Tr. 414).

An MRI in February 2011 showed that Heiden had rotator cuff tendinitis in the left shoulder. (Tr. 495). She also had a left-sided disc herniation at C2/3 with neuroforaminal compromise and moderate left-sided neuroforaminal stenosis. (Tr. 495). Heiden had a cervical epidural steroid injection. (Tr. 495).

7

When Heiden returned to the gynecologic oncologist for follow-up of her cancer in February 2011, she reported no back pain, but was still having pain in her left upper extremity, though she thought it might be getting better. (Tr. 439). She was healing well from radiation, but had persistent erythema and inflammation from the implant. (Tr. 439). Follow-up exams in June 2011, September 2011, and January 2012, found no evidence of recurrence of cancer. (Tr. 563-64, 582, 584, 590).

In May 2011, Heiden reported to the neurologist that she had constant pain in her left arm, but it was tolerable with medications. Heiden stated she had limited use of her left arm and she said she was unable to move her left thumb, index, and middle finger as a result of the blood clot. She said she was continuing with physical therapy. (Tr. 545). The treatment note indicated that Heiden was unable to work at the present time due to limited mobility with the left upper extremity. (Tr. 546).

Heiden received another injection in the left subacromial bursa in August 2011 after it was determined she had a tear in her left rotator cuff. (Tr. 494). That month, she also complained of knee pain and was diagnosed with mild right knee arthritis. (Tr. 494).

Heiden continued to complain of right arm numbness and heaviness in the upper arm. (Tr. 542). In September 2011, Dr. Edwards assessed that Heiden had probable tendinitis or bursitis. Heiden insisted on an MRI because she was concerned about brain cancer based on her headaches. (Tr. 543). The MRI was negative. (Tr. 544). She had left shoulder arthroscopy with limited debridement, arthroscopic subacromial decompression, and arthroscopic resection of the distal clavicle. (Tr. 504). By October 2011, Heiden was doing well and had begun physical therapy. (Tr. 493).

In November 2011, Heiden again complained of bilateral arm numbness. (Tr. 493). Nerve conduction studies showed no evidence of any radiculopathy or peripheral nerve entrapment. She had good passive range of motion in both shoulders and her cervical spine. Because she had failed to improve with therapy, an MRI scan was completed. It showed mild degenerative changes at C1/2 and C2/3. (Tr. 502). There was moderate degenerative disc disease at C3/4, C4/5, C5/6, C6/7, and C7/T1. (Tr. 502). Heiden had another cervical epidural steroid injection in December 2011 and obtained relief, but when the pain recurred, she was referred to a pain clinic. (Tr. 492, 498).

In January 2012, Heiden complained of pain in her left back around her kidney and sometimes in the left upper lateral abdomen. (Tr. 513). Dr. Fruehling determined that the pain was mostly musculoskeletal, and Heiden was prescribed pain medication. A CT scan of the chest showed no evidence of a pulmonary embolism. (Tr. 552). The CT could not exclude a right middle lobe lesion. (Tr. 552-53).

Heiden went to a pain clinic for neck and shoulder pain in January 2012. (Tr. 602). Pedro Perez Cartagena, M.D., stated that Heiden had cervical degenerative disc disease with radicular pain, "cervical acquired on congenital stenosis." She also had myofascial pain syndrome of the cervical paraspinal muscles on the trapezius bilaterally. (Tr. 605-06). Because epidural steroid injections had not given her any benefit, Heiden was given medications and directed to take part in physical therapy. (Tr. 606).

Heiden saw a neurosurgeon, Joshua Anderson, M.D., on February 23, 2012, for neck and arm pain. (Tr. 607). She had difficulty in motor in the left upper extremity

because of allodynia. Otherwise she appeared to have 5/5 strength in bilateral upper and lower extremities. (Tr. 607). She had deep tendon reflexes of 2/4 in the bilateral upper and lower extremities. Dr. Anderson was unable to assess the left arm. (Tr. 607). He determined that Heiden's right shoulder and upper arm pain and left-sided neuropathic pain were the result of some type of brachial plexus trauma. She was to return to the clinic in six weeks to assess the steroid injections. (Tr. 608). She had another epidural steroid injection on February 29, 2012. (Tr. 659).

Heiden continued to seek treatment at the pain clinic in March and April 2012. (Tr. 655, 657-58). She described the upper extremities as weak, tired, numb, and cold. The pain was worse with activity like working on the computer or playing ball with her children. Physical therapy also aggravated her pain, but the pain was eased with heat and lidocaine ointment. Dr. Cartagena could not see any signs of complex regional pain syndrome. He stated that he was waiting for Dr. Anderson's note to see if Heiden was a surgical candidate. The next step in pharmacological therapy would be to add a small dose of a long-acting opioid for pain relief. She was to continue taking Lyrica. (Tr. 656).

On May 5, 2012, Heiden had a CT scan of the chest. (Tr. 678). There was a mass in the lateral segment of the right middle lobe and right-sided lymphadenopathy in the hilum. (Tr. 678).

Heiden took part in physical therapy on several occasions. An initial evaluation for back pain was completed on October 19, 2010. (Tr. 621). At the time, Heiden ambulated with a guarded posture and demonstrated pain with transfers. She was limited with flexion and extension and right side bending of the lumbar spine. Her strength on the left lower extremity was 5/5 with manual muscle testing. The right was

4/5 for knee extension, knee flexion, and 5/5 with ankle dorsiflexion. She demonstrated significant tenderness in the right lumbar, paraspinal and SI regions. (Tr. 621). The plan was to see Heiden three times each week. (Tr. 622). By November 2010, Heiden reported decreased pain. (Tr. 618). She missed appointments between December 9, 2010, and January 18, 2011, because of treatments for another illness. (Tr. 609-12).

By February 2011, Heiden also complained about her left upper extremity shoulder and neck symptoms. (Tr. 652). She received physical therapy treatment on February 8 and 10, 2011. (Tr. 651). She made significant improvement in desensitization, but hypersensitivity continued to be a problem. (Tr. 625). She had been able to increase range of motion. (Tr. 625). When she had not attended any additional treatments, she was discharged on March 12, 2011. (Tr. 647).

Heiden was again evaluated by a physical therapist on August 5, 2011, where she reported an onset date of left shoulder and arm pain on July 1, 2011. (Tr. 646). She continued therapy until August 31, 2011, and she was making progress in all areas. Her active range of motion in her hand was within functional limits. (Tr. 623). She did not attend appointments between September 5 and 17, 2011. (Tr. 639-40).

Heiden again began physical therapy for shoulder pain, weakness, and decreased range of motion September 23, 2011. (Tr. 637). She was wearing a sling and demonstrated guarded posture of the left upper extremity. (Tr. 637). She demonstrated some difficulty with transfers from supine to sitting. (Tr. 637). She continued physical therapy until October 21, 2011, but was discharged on November 19, 2011, when she had not attended any sessions for a month. (Tr. 628, 632-36). She

was evaluated again on January 31, 2012, and was scheduled to have treatments three times a week for 12 weeks. (Tr. 662).

Concerning Heiden's mental health, she underwent a biopsychosocial pre-treatment assessment before she began the radiation treatments in November 2010. (Tr. 577). Linda Rehovsky, M.A., LMHP, reported that Heiden's 17-year-old daughter described Heiden as scared, anxious, and tired, and her daughter had been excused from school in order to help her mother. (Tr. 577). Heiden reported that she had been unemployed for a number of years due to a health condition. (Tr. 578). Rehovsky determined that Heiden had an adjustment disorder with mixed anxiety and depressed mood. (Tr. 578). Heiden reported that she had suffered from severe migraine headaches for a number of years and the medication for the headaches resulted in her being unemployable. (Tr. 579). Heiden delayed therapy until other medical treatment had been determined. (Tr. 463).

On April 8, 2011, Heiden returned, stating that her problems were worry, anxiety, and fear regarding her diagnosis of cancer. (Tr. 463). Heiden saw Rehovsky again on September 7, 2011. Heiden complained of difficulties with sleep, anxiety and worry, depression, increased child management issues, minimization of stress and conflict in her environment, and marital conflict. (Tr. 575).

John Meidlinger, Ph.D., conducted an initial psychological diagnostic interview on September 8, 2011. (Tr. 573). He determined that Heiden had an adjustment disorder with mixed anxiety and depressed mood. (Tr. 573). He recommended that Heiden continue outpatient counseling. (Tr. 574).

12

On February 8, 2012, David Rehovsky, M.S., LMHP, wrote a letter to Heiden's attorney stating that he had been seeing her since November 2011. She had been relatively sporadic in attendance with numerous health issues and fatigue that she experienced in trying to live her life. (Tr. 567).

**B.     Medical Opinion Evidence**

On January 10, 2011, Jerry Reed, M.D., completed a physical RFC assessment. (Tr. 405). He noted that Heiden's primary diagnosis was cervical cancer and her secondary diagnosis was migraines and brachial plexus injury. (Tr. 405). Dr. Reed stated that Heiden could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk and sit about six hours in an eight-hour workday. She had no limits on pushing and/or pulling. (Tr. 406). She could occasionally climb a ramp or stairs and could frequently balance, stoop, kneel, crouch, and crawl. (Tr. 407). She had no manipulative, visual, or communicative limitations. (Tr. 408-09). She had no environmental limitations, except that she should avoid concentrated exposure to fumes, odors, dust, gases, and hazards. (Tr. 409). Dr. Reed stated that Heiden's symptoms were supported by the medical records, but they were not expected to meet the requirements for duration. Heiden would be capable of activities as described in the RFC by no later than September 10, 2011. (Tr. 410). Dr. Reed stated that the medical evidence indicated that Heiden was currently going through treatment for cervical cancer. Medical records indicated that she appeared to be having a good response to therapy on December 16, 2010. (Tr. 412). Dr. Reed stated that Heiden's prognosis was unknown, but the available evidence indicated that her treatment was going well. (Tr. 412).

Steven Higgins, M.D., completed a physical RFC assessment on May 5, 2011. (Tr. 490). He noted that evidence suggested Heiden was responding to treatment for cervical cancer and there was no evidence of reoccurrence. On reconsideration, she reported no changes in her health and no new illnesses or injuries. Heiden reported a history of a left arm blood clot and inability to move the fingers on the left hand. An electrodiagnostic evaluation on February 7, 2011, showed severe acute and chronic denervation in the median nerve above the level of the antecubital fossa. The impression was median neuropathy which was not amenable to surgery. Dr. Higgins said it would "hopefully" heal with time and physical therapy. (Tr. 490). Dr. Higgins affirmed the limitations as outlined in the RFC completed by Dr. Reed. (Tr. 491).

Dr. Fruehling, Heiden's treating physician, completed a medical source statement on February 16, 2012. (Tr. 598-601). He noted that he had treated Heiden for cervical cancer, deep vein thrombosis, and COPD with asthma. (Tr. 598). Her symptoms had included general malaise, muscle weakness in the arms and legs, swelling in the left arm, chronic migraine headaches, and difficulty with range of motion in the left hand. (Tr. 598). Dr. Fruehling stated that Heiden might be absent from work about three or four times a month for ongoing cancer surveillance. She could frequently lift or carry up to five pounds, but never lift or carry more than that. She could sit for one hour at a time and stand or walk up to one hour at a time. She could sit for one hour in an eight-hour day and stand or walk up to one hour a day in an eight-hour day. (Tr. 599). Side effects from chemotherapy and radiation included possible necrosis of the mucosal of the cervix and upper vaginal region, radiation proctitis, blood clots in the arm, and fatigue from radiation. (Tr. 600). Dr. Fruehling said Heiden would need to lie down or rest every

14

four hours in an eight-hour day. Heiden had significant limitations in repetitive reaching, handling or fingering. She could use her right hand 50 percent of the time and her right arm and fingers 100 percent of the time. She could not use her left hand, fingers, or arm. (Tr. 600). Her prognosis was good to fair. (Tr. 601).

Christopher Milne, Ph.D., completed a psychiatric review technique in January 2011. (Tr. 390). He stated that Heiden had depression, but Milne had insufficient evidence to evaluate her psychological condition. He could not determine whether Heiden had any restriction of activities of daily living, difficulties in maintaining social functioning or maintaining concentration, persistence, or pace, or repeated episodes of decompensation. (Tr. 400). Milne stated that Heiden missed two separate psychological evaluations. She indicated that she missed one because she had an appointment for her child in Omaha. She did not indicate that she missed the appointment due to her own personal or medical condition. (Tr. 402).

Daniel Fudge, Ph.D., completed a psychological report for disability on April 28, 2011. (Tr. 468). Heiden reported that she had been depressed since 1993 and had been in therapy from 1994 to 1996. (Tr. 469-70). She was not currently looking for work. Heiden reported that her daily activities and memory were not affected. She reported her interests were limited because she did not do the things she previously enjoyed and she did not like to socialize. Heiden reported her daily activities and work were not limited by depression. She reported periods of symptom decompensation when there was fighting or arguing in the family. Heiden was not taking any medication for psychological issues. (Tr. 469). Her mood appeared to be neutral and her affect was euthymic. (Tr. 470). Heiden reported that her mood was usually depressed, neutral,

angry, and irritated. Fudge stated that Heiden's emotional reactions were appropriate during the interview. Fudge did not observe any signs of anxiety, tension, psychomotor disturbance, or substance abuse. Heiden reported that her daily activities were getting up, getting her children ready for school, taking them to school, doing light housework, watching television, cooking and eating. Fudge stated that Heiden should not have any restrictions on her activities of daily living. (Tr. 470).

Fudge stated that Heiden could have problems with social functioning as she did not like to be around people. She should be able to concentrate to complete a task as she did so during the examination. Fudge stated that Heiden should be able to remember instructions and perform them under supervision as she did so during the evaluation. Fudge stated that Heiden had adjustment disorder with mixed anxiety and depression. Fudge stated that the prognosis was good for Heiden from the mental health standpoint. (Tr. 471). Fudge stated that if Heiden would attend therapy on a consistent basis in conjunction with taking her medications consistently, her depressive symptoms and anxiety symptoms could be significantly reduced to the point where she should be able to maintain gainful employment and not be hampered by her mental health issues. Fudge stated that a physician would have to determine whether Heiden could work due to her medical problems. (Tr. 471). Fudge stated that Heiden had the ability to sustain concentration and attention needed for task completion, to understand, remember, and carry out short and simple instructions under ordinary supervision, to relate appropriately to coworkers and supervisors, and to adapt to changes in her environment. (Tr. 473).

16

Linda Schmechel, Ph.D., completed a psychiatric review technique on May 4, 2011. (Tr. 475). She determined that Heiden did not have a severe impairment that would meet or equal any listing. (Tr. 475, 487).  Heiden had an adjustment disorder with mixed anxiety and depressed mood. (Tr. 478). Heiden had no restriction of activities of daily living or difficulties in maintaining concentration, persistence, or pace. (Tr. 485). She had mild difficulties in maintaining social functioning and no repeated episodes of decompensation. (Tr. 485). Heiden had no history of hospitalization for psychological conditions. (Tr. 486). Schmechel gave considerable weight to Fudge's opinion which was consistent with the mental status examination and other findings. (Tr. 487). Heiden's allegations were partially consistent with the overall pattern of evidence. Although Heiden alleged depression and short-term memory problems, she was able to count by threes to 15, was fully oriented, had good abstract thought, was cooperative, and was able to concentrate and participate fully in the evaluation. Her activities of daily living appeared to be limited more from a physical standpoint rather than a psychological standpoint. The overall pattern of evidence was not consistent with any allegations of severe psychological limitations. Schmechel found Heiden's impairment to be nonsevere. (Tr. 487).

**C.    Other Evidence**

Heiden told a disability interviewer that she quit her last job in 2001 because she was pregnant and had gallstones. She did not have gallstone surgery until 2002 after her baby was born. (Tr. 157). She said her migraines caused her difficulty in reading. (Tr. 157). She listed her medical conditions as migraines, problems reading, depression,

and seasonal allergies. (Tr. 160). Her previous job history included work as a babysitter from 2000 to 2001 and as a factory machine operator from 1994 to 1999. (Tr. 162).

On June 22, 2010, Heiden completed a daily activities and symptoms report, in which she stated that she is limited in driving because the sun hurt her eyes. (Tr. 175). She stated she could not cook very well, but she was able to care for her day-to-day personal needs. She could clean the house. She could mow for 20 minutes and then her head started to hurt. (Tr.176). She had no hobbies and had no social activities because of her headaches. She could watch television for 30 minutes. She slept six hours a night. She said she could walk half a mile or for 45 minutes and then her legs started to cramp. She could stand for 30 minutes and could sit for one hour at a time. (Tr. 176). Heiden said her symptoms included headaches and joint pain in her knees. She broke out in hives if something cold touched her skin, and she felt tingling all over her body. Heiden said she had the symptoms all the time. (Tr. 177).

Jeffrey Heiden, her husband, stated that he prepared Heiden's meals. (Tr. 184). She did not visit with friends or relatives and did not go for walks. She took care of children and did her own chores. She watched television for one to two hours, but she did not read. She did not participate in any other activities. (Tr. 184). She did not interact with people in social activities, but she cared for pets. She adjusted to changes at home fairly well. (Tr. 185).

On March 31, 2011, Heiden stated that she did not visit others because she did not want to get sick. (Tr. 206). She took her youngest daughter to Special Olympics. (Tr. 206). She said she could not use her left arm, so she did not cook for herself or do household chores. (Tr. 206). Heiden said she was not allowed to drive because her

18

reflexes were slow. For relaxation, she spent time "hanging out" and took baths. She watched television for two hours at a time. (Tr. 207). She said she had anxiety reactions when she felt tired, down, and did not want to do anything. (Tr. 208-09).

**D.    Hearing Evidence**

At a hearing on February 14, 2012, Heiden testified that she completed 11th grade and did not receive a GED. (Tr. 34). She last worked in 2001. (Tr. 35). Heiden said she had worked as a babysitter for a year, but she quit because her migraines were too bad. She had also worked as a factory machine operator between 1994 and 1998. (Tr. 35-36). In that job, she lifted 50 pounds and she stood for seven to eight hours. (Tr. 36-37). Heiden said after she was diagnosed with cervical cancer in September 2010, she felt weak all the time. (Tr. 37). When she had blood clots in her left arm in November 2010, the treatment resulted in nerve damage to three of her fingers, which she said she could barely move. (Tr. 38, 42). She had numbness in her left thumb, first and middle fingers. (Tr. 42). She also had problems with her back, which were treated with injections, and she had surgery to repair a torn rotator cuff in her shoulder. (Tr. 38).

Heiden said she cannot lift more than five pounds and can only walk about 25 steps before she needed to sit. (Tr. 38-39). She said she had arthritis in her knees. (Tr. 39). Heiden said she could not tie her shoes and had difficulty getting dressed. (Tr. 42). Her back caused pain when she bent over. She had injections in the low back and in her neck. (Tr. 44-46). Heiden said she had headaches five times a week. (Tr. 46). She said she could only be on her feet for one minute and she could sit for 45 minutes. (Tr. 48). She would have to lie down five times during a full eight-hour workday. (Tr. 48-49).

19

Heiden said she had difficulty doing laundry, sweeping, and doing dishes. (Tr. 49). She was able to bathe, but her daughter washed her hair. (Tr. 53).

Robin Cook, vocational expert, testified that Heiden's previous job as a factory machine operator could be classified as a molder-trimmer, which is considered semi-skilled work at the light exertional level. (Tr. 58). The ALJ asked the VE to assume an individual of Heiden's age, education, and work experience who can occasionally lift 10 pounds, who can stand and walk for up to two hours, and sit for up to six hours, occasionally climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, frequently balance, never kneel, crouch, or crawl, avoid overhead reaching with the left upper extremity, frequently finger, avoid all exposure to vibration and irritants, and avoid operational control of moving machinery, unprotected heights, and hazardous machinery. (Tr. 59). With those limitations, Cook stated that Heiden could not perform her past work. (Tr. 59). However, she would be able to work as a call-out operator, which was sedentary strength level, as a final assembler optical, which was also sedentary strength level, and as a document preparer, microfilm, which was also sedentary strength level. There were a sufficient number of jobs in all categories in the nation and the state of Nebraska. (Tr. 61). If the individual could do no fingering or handling with the nondominant hand, Cook said there would be no work in the national economy. Cook said there is no one-armed work that would meet the parameters of the hypothetical. There would also be no jobs available for a person who had to lie down five times a day for 30 minutes at a time. (Tr. 62).

### III.  STANDARD OF REVIEW

This court must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action."  *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

This court must also determine whether the Commissioner's decision "is based on legal error."  *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  *Id.* (citations omitted).  No deference is owed to the Commissioner's legal conclusions.

*See Brueggemann v. Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).  *See also Collins*,
648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on
legal error is reviewed de novo).

## IV.   ANALYSIS

**A.    RFC Assessment and Hypothetical Question**

Heiden asserts that there is not substantial evidence to support the ALJ's RFC
assessment and the hypothetical question asked of the vocational expert. (Pl.'s Br. at
13). She questions only the issues related to her left arm and hand and does not assert
any error related to any other impairments. The ALJ found that Heiden's severe
impairments included status-post left rotator cuff repair, a history of deep vein
thrombosis in the left upper extremity, and median nerve neuropathy of the left upper
extremity. (Tr. 12). In the RFC assessment, the ALJ stated that Heiden could lift up to
10 pounds occasionally, stand or walk for two hours in an eight-hour workday, and sit
for six hours in an eight-hour workday. (Tr. 15).

The evidence included the opinions of the State agency medical consultants,
who determined that Heiden could perform work at the light exertional level with some
postural and environmental limitations. (Tr. 17). Dr. Reed stated that Heiden could meet
the basic demands of light work, which involved lifting up to 20 pounds. Dr. Higgins
affirmed Dr. Reed's assessment. (Tr. 406-13, 491). The ALJ gave those opinions some
weight because they were rendered after a review of the medical record and the
consultants were familiar with the definitions and evidentiary standards used by the
Social Security Administration. However, the ALJ gave Heiden the benefit of the doubt
and found that the medical record indicated she was limited to the RFC, which included

22

some manipulative limitations due to her deep vein thrombosis and rotator cuff repair. (Tr. 17).

An ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant. *Id.*, 390 F.3d at 592.

Heiden argues that she had more significant limitations with her left arm than determined by the ALJ. However, as the ALJ noted, Heiden's functioning improved with physical therapy. (Tr. 17-18). The therapist noted that Heiden was making progress and her active range of motion was "within functional limits." (Tr. 623). Her grip was stronger on the right hand, but she had some grip strength on the left hand. (Tr. 623). The ALJ also noted that Heiden had attended physical therapy on a sporadic basis. (Tr. 18).

The record showed that Heiden was able to take care of herself and could care for her children. (Tr. 18). She was also able to do housework and cook. (Tr. 176). Heiden's husband reported that although he prepared Heiden's meals, she was able to care for their children and did her own chores. (Tr. 184).

Heiden's alleged impairment with her arm apparently arose from a deep vein thrombosis that developed after she began chemotherapy treatment, which was administered through a port. (Tr. 303, 344-46). The port was removed and the deep vein thrombosis was treated. (Tr. 354). X-rays of Heiden's shoulder showed no fracture, dislocation, or other bony abnormality. (Tr. 322). An ultrasound of the upper arm showed considerable improvement between November 20 and December 17, 2010. (Tr.

23

323). In February 2011, Dr. Edwards determined that Heiden had median neuropathy, but no evidence of cervical radiculopathy. (Tr. 414). Dr. Edwards stated that the arm would heal with physical therapy, but she noted that it could take up to two years. (Tr. 414). In May 2011, Heiden reported that the pain was tolerable with medications. (Tr. 545). Nerve conduction studies in November 2011 showed no evidence of any radiculopathy or peripheral nerve entrapment. (Tr. 493). She had good passive range of motion in both shoulders and her cervical spine. (Tr. 493). In February 2012, a neurosurgeon reported that Heiden appeared to have 5/5 strength in bilateral upper and lower extremities. (Tr. 607). He was unable to assess the left arm and noted that her left-sided neuropathic pain was from what sounded like some type of brachial plexus trauma. (Tr. 607-08). In April 2012, Heiden reported that heat and lidocaine helped her pain. (Tr. 656). The medical record includes sufficient evidence to support the ALJ's finding that Heiden could use her left hand to some extent.

Heiden argues that the ALJ erred in referring to an electrodiagnostic evaluation that took place in September 2011. (Pl.'s Br. at 19). The ALJ stated that the evaluation was normal and revealed no evidence of neuropathy, peripheral neuropathy, or radiculopathy, and that Dr. Edwards diagnosed Heiden with median neuropathy in her left arm. However, the September 2011 evaluation was conducted on Heiden's right arm. Heiden claims the ALJ was mistaken in believing that the testing was done on Heiden's left arm. The court finds that the ALJ's error was harmless because it did not change the RFC finding. To show that an error was not harmless, a claimant must provide some indication that the ALJ would have decided differently if the error had not occurred. See Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012). The ALJ found the

24

median nerve neuropathy in Heiden's left arm was a severe impairment, which shows that the ALJ did not consider that the right arm electrodiagnostic testing negated the impairment. (Tr. 12).

Heiden also objects to the hypothetical question asked of the vocational expert. The ALJ asked Cook, the VE, a hypothetical question based on Heiden's age, education, work experience, and limitations. The question included a provision that the individual would avoid overhead reaching with the left upper extremity and be able to frequently use her fingers. (Tr. 59). The VE stated that given those limitations, Heiden could not perform her past work, but she would be able to work in sedentary-strength level jobs such as a call-out operator, as a final assembler optical, and as a document preparer, microfilm. All of the jobs had a significant number available in the nation and the state of Nebraska. (Tr. 60-61). The ALJ asked Cook whether a person who could do no fingering or handling with the nondominant hand would be able to complete those jobs, and Cook said there would be no work in the national economy for such a person. Cook said there is no one-armed work that would meet the parameters of the hypothetical. (Tr. 62). The hypothetical question included all of the severe impairments as determined by the ALJ and was properly asked.

Heiden relies on the medical source statement of Dr. Fruehling, which indicated that Heiden had muscle weakness in her arms and legs and difficulty with range of motion in her left hand. (Tr. 598). He stated that Heiden had significant limitations in doing repetitive reaching, handling, or fingering and that she could not grasp, turn or twist objects with her left hand, could not complete fine manipulations with the fingers of her left hand, and could not reach overhead with her left arm. (Tr. 600).

However, the ALJ gave Dr. Fruehling's opinion little weight because it took into account limits that were related to Heiden's cancer treatment and she was not undergoing any cancer treatment at the time of the ALJ's decision. There was no indication that she would need any treatment in the near future. The ALJ also found that Dr. Fruehling's opinion was not consistent with his recent treating notes which indicated that Heiden had no neck symptoms, was in no acute distress, and had a normal gait and stance. (Tr. 17).

"Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* The hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the "concrete consequences" of those impairments." *Id.*

The hypothetical question presented in this case included all of Heiden's limitations that the ALJ found were supported by the evidence and included in the RFC. Because the record supported the ALJ's findings in the RFC, the hypothetical question was proper. The VE's response supported the ALJ's finding that Heiden was not disabled.

## B.    Heiden's Credibility

Heiden also argues that the ALJ committed error in ruling on Heiden's credibility. (Pl.'s Br. at 20). The ALJ found that Heiden's medically determinable impairments could

reasonably be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not generally fully credible. (Tr. 18). The ALJ found there was insufficient evidence in the record to support the level of limitation alleged by Heiden. On the contrary, she was able to engage in a wide range of activities of daily living that could translate into performing a job, including driving and taking care of children. (Tr. 18).

The record supports the ALJ's finding. Heiden reported in April 2011 that she did light housework, cooked, and took her children to school. In February 2012, it was noted that she was an active and involved grandmother. Heiden had received very good relief from a cervical epidural and her back continued to improve with physical therapy. In January 2012, she had no neck symptoms, was in no acute distress, and had a normal gait and stance. Her range of motion in the shoulder was improving before she stopped attending physical therapy. An electrodiagnostic evaluation in September 2011 was normal and revealed no evidence of neuropathy, peripheral neuropathy, or radiculopathy. She underwent thrombolytic therapy with good results and x-rays of her left arm showed only a small amount of non-occlusive thrombus within the left subclavian vein that was considerably improved.

The duty of deciding questions of fact, including the credibility of a claimant's subjective testimony, rests with the Commissioner. *Gregg v. Barnhart*, 354 F.3d 710 (8th Cir. 2003). The crucial question is not whether a claimant experienced pain, but whether her credible subjective complaints prevent her from performing any type of work. *Id.* If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court will normally defer to the ALJ's credibility determination. *Id.*

27

To analyze a claimant's subjective complaints, the ALJ considers the entire record including the medical records, statements by a third party and the claimant, and factors including the claimant's daily activities, the duration, frequency and intensity of pain, dosage, effectiveness, and side effects of medication, precipitating and aggravating factors, and functional restrictions. *See* 20 C.F.R. §§ 404.1529, 416.929; *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ considered all of those factors.

The court also notes that the ALJ properly found that Heiden's other alleged impairments were non-severe because they did not show any limitation in Heiden's ability to perform basic work activities. (Tr. 12). There was no evidence of a recurrence of cervical cancer. Heiden's migraine headaches were reportedly controlled, as was her COPD/asthma. X-rays showed the arthritis in Heiden's knee was mild. (Tr. 12).

The ALJ also properly found that Heiden's alleged mental impairment of depression was not severe because it resulted in no limitations in activities of daily living, mild limitation in the area of social functioning, no limitation in the area of concentration, persistence, or pace, and no episodes of decompensation. (Tr. 13-14).

Throughout the record are examples of Heiden's complaints of pain. However, "[w]hile pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability.'" *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011), *quoting Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996).

The ALJ also noted that Heiden was not consistently compliant with her medical treatment. She attended physical therapy sporadically and did not appear for two

28

consultative examinations. The ALJ stated that these facts suggest that Heiden may not believe her condition is as serious as alleged, which distracted from her credibility. (Tr. 18). The failure to seek regular medical treatment is inconsistent with complaints of disabling pain. *Comstock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996).

Heiden had not worked for a long period before her alleged onset date, which the ALJ indicated called into question Heiden's motivation for finding work. (Tr. 18). Heiden's earnings record showed she only posted earnings during nine years and that her lifetime earnings were only $55,000. (Tr. 153). A sporadic work history has been held to be relevant to an ALJ's credibility analysis. *See Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993).

An ALJ is justified in discounting a claimant's credibility if there are inconsistencies between the claimant's allegations of disabling symptoms and the claimant's activity level. *See McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013). The record showed that Heiden was able to care for her children, drive, and do light housework, and was described by a counselor as an active and involved grandmother. (Tr. 18, 50-51, 567). Her ability to care for children and do housework was inconsistent with her testimony that she was weak, could hardly walk, and could only be on her feet for one minute at a time. (Tr. 37, 38, 48).

"Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.'" *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006). The objective medical evidence in the

29

record here supports the ALJ's finding concerning Heiden's subjective pain allegations, and the record supports the ALJ's credibility finding.

## V.   CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.

Dated this 19th day of June, 2014

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge